The will by words of conveyance devises to the executors all the real estate of the testator for the use of the parties beneficially interested, and constitutes the executors trustees of his personal estate for their use in order more fully to carry out his intentions. This is a devise of the real and personal estate to the trustees in trust to sell the same for the benefit of the legatees, and was a valid express trust. It is immaterial whether the trust was to receive the rents and pay them over to those interested, although this probably was necessary to carry out the intention of the testator. There was a positive direction to convert the lands into money; that makes the whole estate in effect personal from the death of the testator, and when once converted into personal estate it was to remain in the hands of the executors; they were to invest the proceeds of sale on bond and mortgage on real estate and keep it so invested. They were, therefore, the parties to receive the income and to pay it out. They would not be justified in passing into the custody of Myron or of his sister any aliquot part of the capital of the estate. *Page 48 
for that would be to put the capital at risk, and Myron and his sister had each at most a life interest in the capital, and the reversion was to go to others. The executors, therefore, must retain the legal title to the securities in their own names and hold them as trustees, and as trustees receive the income and pay it out as it shall accrue. Such was the effect of the will; then came the codicil, which, as the expression of the last wish of the testator, must control the former instrument. That declares it to be his will, in case creditors' bills be filed against Myron and judgments be obtained against him thereon, that from that period the estate or income of Myron shall cease; and the testator thereupon directs his executors thenceforth to expend the interest or income for the support of the family of Myron by paying it to his wife or in any other practicable way.
By the will the beneficial interest in a certain share was in Myron during his life, and might perhaps have been reached in part by his creditors. The testator then alters that interest, so that on a certain event it should cease and the income should thenceforth pass to others. As the will and codicil form but one instrument, the estate, which the will might have given but for the codicil, never existed. The only estate or interest which Myron ever had was that which was created by the joint effect of the two instruments: that was a right to have the income of a certain share paid over to him until a judgment creditor's bill should be filed against him and a decree had thereon, and then that right was to cease and to pass in favor of his family. The father when he made the will and codicil owned the whole estate; he had the absolute power over it; he could carve out of it such interests as he pleased, if he violated no rule of law in doing so; he could give one-third to Myron so long as he lived in this state, or so long as he lived out of it, or until a third person should return from Rome or go to it, or on *Page 49 
any other similar arbitrary contingency, according to his will or caprice. He was under no obligation, legal or moral, to give his property so that the creditors of Myron could take it from him or his family. His moral duty and his duty to the state were greater to save Myron and his family from want or from being a burthen on the public, than to devote his property to pay his son's creditors. There is therefore no public policy which should frustrate the testator's intention.
The testator has not as supposed by the counsel for the plaintiff, given to his son a certain estate and then attempted while the estate continued to take from it one of the incidents which the law binds inflexibly to it; but he gives him a certain right in the property, which is to continue for a limited time until an uncertain event shall occur, and then, when that event occurs, is to cease entirely. While the son holds it he holds it with all the incidents which the law attaches to it; when the event, on which it is to cease, occurs, the son has no longer any right or interest in it, and with the loss of his right all right of his creditors also falls to the ground. If the creditors could find any previously arising income, which the son had not called for and could call for, undisposed of and in the hands of the executors, their rights to that would remain unimpaired; but when his right ceased, so also did theirs.
In Shee v. Hale (13 Ves., 404), the testator bequeathed his residuary estate to trustees to pay to his son an annuity during his natural life, or until he should contract to part with the annuity or some part of it, or to charge it by anticipation, or should empower any person to receive any part thereof except the next quarterly payment after such power; and declared that if his son should sign any writing to do any of those things the annuity should cease to be payable to him and should sink into the residue. The son took the benefit of an insolvent law and inserted the annuity in the schedule of his property. The assignees claimed the *Page 50 
annuity, but their bill was dismissed. The only doubt that seemed to be the foundation for the claim was whether the son had done such an act as the will provided against; the master of the rolls held that he had. In Lewis v. Lewis (6 Simons, 304), the testator had devised lands to trustees in trust to receive the rents and pay £ 300 yearly for the maintenance of his son's family and the residue for the use of his son, but so that he should have no power to charge or alienate it, and that it should not be subject to his debts or be taken for the use of his creditors. These words may have been inoperative if they had stood alone; but the testator added that if the son should at any time frustrate the trust of the will, or interfere therewith or with the receipt of the rents, then the said residue should not be paid to his son, but should be accumulated. The son conveyed the property to trustees for his creditors, and it was held that in doing so he had attempted to frustrate the trust of the will, and so had brought about the contingency on which his interest in the residue was to cease. The trustees were directed to hold the residue to accumulated under the will. In Cooper v. Wyatt (5Madd., 482), the testator devised to trustees certain estates, first to furnish a maintenance for the family of his nephew, Samuel Herbert, and to give the residue to him but not to his assigns, and declared his will to be, that if his nephew should by any means sell, dispose of or encumber the right he might have for life under the will, then his said right should cease and be applied for the benefit of the children of the nephew in such manner as the trustees should think proper. Samuel Herbert became bankrupt and his estate was assigned to assignees. It was contended not that the testator might not have caused the estate to cease by bankruptcy, but that bankruptcy was a proceeding ininvitum, and so not the act of the nephew and that the will only provided against voluntary acts of the nephew. The rule is laid down plainly by the vice-chancellor: "The true inquiry in this case is whether, *Page 51 
by the expressions used in this will, it can be collected to have been the intention of the testator that the estate should determine as to the nephew in the event of his bankruptcy." The court held it was so; that it was to cease "whenever it could no longer be the subject of his immediate personal enjoyment." The same principle was recognized in Graves v. Dolphin (1Simons, 66), and it was there said that "the testator might if he had thought fit have made the annuity determinable by the bankruptcy of his son;" instead of that he gave estates to trustees in trust to pay an annuity to his son for life, and then declared it to be his intention that this annuity was for the personal maintenance of his son and should not be liable for his debts, but should be paid to him as it became due. It failed to contain any direction giving it over to another on the bankruptcy of his son; it therefore continued in that event to be his, and passed to his assignees. The same distinction was stated and applied in Brandon v. Robinson (18 Ves., 429). Lord Chancellor Eldon said: "There is no doubt that property may be given to a man until he shall become bankrupt. It is equally clear, generally speaking, that if property is given to a man for his life, the donor cannot take away the incidents to a life estate. If a condition is so expressed as to amount to a limitation, neither the man nor his assignees can have it beyond the period limited."
Thus the rule is made not to depend on the question whether the act causing the termination of the estate comes from the tenant for life or from his creditors, but on its being made (whatever it may be) a cause for the transfer of the estate to another. InHallett v. Thompson (5 Paige, 583), there was no bequest over on any contingency. In Degraw v. Clason (11 Paige,
136), there was what the chancellor considered an absolute estate in the legatee, alienable by her although held in trust for her, and there were no *Page 52 
words showing that the bequest was for the personal support of the legatee, and there was no bequest over.
The judgment of the supreme court should be affirmed.
Judgment affirmed.